**Opinion filed June 11, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-07-00317-CV

_____

**ANNETTE MCCARTY, Appellant,**

**V.**

**CLINTON T. MONTGOMERY, AS MANAGING TRUSTEE
OF THE TRIMONT IRREVOCABLE TRUSTS, AND ELTON
MONTGOMERY, Appellees**

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. C41088**

**O P I N I O N**

This is a real estate contract dispute. Clinton T. Montgomery, as managing trustee of the Trimont Irrevocable Trusts (Trimont), sued Annette McCarty seeking specific performance.[1] McCarty responded with a counterclaim against Trimont and a third-party claim against Elton

_____

[1]Palo Pinto County Abstract Company was also named as a defendant, but it was dismissed before filing an answer when it deposited the contract's earnest money into the registry of the court.

Montgomery alleging breach of contract and tort claims. The trial court granted Trimont's and Elton Montgomery's motions for summary judgment and subsequently entered a final judgment in their favor. We affirm.

## I. *Background Facts*

McCarty agreed to sell to Elton Montgomery an undivided one-half interest in a 950.3-acre tract in Palo Pinto County for $200,000. The parties utilized a Texas Real Estate Commission form, TREC No. 25-4, to document their agreement.[2] Montgomery deposited $2,500 in earnest money with Palo Pinto County Abstract Company and assigned the contract to Trimont and Ray Herring. Herring subsequently assigned his interest to Trimont. For convenience, we will refer to Montgomery rather than Trimont as the contracting party.

The contract required McCarty to furnish Montgomery with a title policy. That title policy was allowed certain enumerated exceptions.[3] McCarty was also required to furnish a commitment for title insurance, legible copies of restrictive covenants, and documents evidencing exceptions in the commitment. While preparing a commitment, Palo Pinto County Abstract discovered that a federal tax lien burdened the property. The lien arose because McCarty's estranged husband failed to pay income taxes after their separation in 1995. McCarty knew that the IRS had filed tax liens on their Brownwood home, but she did not know that it had filed a lien on her Palo Pinto County property. The lien was dated November 5, 1997. As of that date, the unpaid balance was $28,676.60, but the lien had grown to approximately $50,000 when discovered by Palo Pinto County Abstract.

---

[2]McCarty argues that this was not a standard form and points to differences between it and a TREC form she attached to her brief. The parties utilized TREC No. 25-4 as their base document and customized it. The form McCarty attached to her brief is TREC No. 25-5, a subsequent version of this form. The Texas Real Estate Commission revised this form again on June 30, 2008. The current version is TREC 25-6 and is available at http://www.trec.state.tx.us/formslawscontracts/forms/forms-contracts.asp.

[3]The permitted exceptions were:
    1. The standard printed exception for standby fees, taxes and assessments.
    2. Liens created as part of the [seller financing].
    3. Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
    4. The standard printed exception as to marital rights.
    5. The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
    6. The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the exception amended to read, "shortages in area."

McCarty's real estate agent, Blake Hortenstine, asked Palo Pinto County Abstract to wait on the title commitment until McCarty determined what steps could be taken with regard to the lien. Hortenstine also informed Montgomery about the lien and the need for additional time. Montgomery filed an affidavit in the real property records of Palo Pinto County. The affidavit included a copy of the contract and indicated Montgomery's belief that he had the right to insist upon specific performance and his intention to do so. McCarty asserted that she did not owe the underlying taxes and that, because the land was her separate property, it was not subject to the lien. McCarty also lacked the funds to pay the taxes and would not receive enough money from the sale of the property to pay them. There were some discussions about renegotiating the contract so that McCarty could pay the lien at closing, but she was adamant in her refusal to do so. During her deposition, McCarty testified that, even if Montgomery had offered her one million dollars, she would not have paid the lien. Hortenstine informed Palo Pinto County Abstract that McCarty would not pay the lien. Palo Pinto County Abstract's owner, Neal Grantham, understood that it would not be paid for issuing a title commitment and, therefore, one was not issued.

Hortenstine forwarded Montgomery a letter from McCarty in which she stated: "I need to terminate the contract because of the situation with the IRS lien that currently clouds the title." Hortenstine also furnished a signed release allowing Palo Pinto County Abstract to return Montgomery's earnest money deposit. Montgomery took issue with McCarty's letter and advised her that the refusal to discharge the tax lien was "altogether unacceptable." He rejected the offer to return the escrow money and insisted upon proceeding to closing. McCarty offered to close with the lien in place, but Montgomery refused.

McCarty subsequently executed an oil and gas lease with R.M. Hill Operating, Inc. This lease covered a portion of the property that she had earlier contracted to sell to Montgomery. When Montgomery learned of this, he contacted her directly and accused her of criminal misconduct. McCarty alleges that she later met with Montgomery and his attorney at a restaurant and that they lied to her to obtain her signature on an affidavit. McCarty alleges that Montgomery and his counsel promised her that they would take the affidavit to Hill Operating and try to convince it to pay the lien and that, if that failed, they would hire someone to work on her behalf to see what could be done. McCarty signed the affidavit. That affidavit states that, prior to signing a lease with Hill Operating,

3

she advised them that Montgomery had the right to move forward with the purchase of the land and minerals. McCarty testified at her deposition that she understood this meant that Montgomery had the right to move forward at the time he signed the contract and that she did not realize she was being asked to sign an affidavit stating that he still had the right to move forward.

McCarty filed a motion for partial summary judgment arguing that she had no liability to Trimont under the real estate contract. Trimont filed a motion for summary judgment seeking specific performance, and Trimont and Montgomery filed a traditional and no-evidence motion for summary judgment attacking McCarty's affirmative claims. The trial court granted Trimont's and Montgomery's motions, including Trimont's request for specific performance, and denied McCarty's motion. The order provided that a separate hearing would be held to determine the manner of specific performance. McCarty filed for bankruptcy. The bankruptcy court lifted the stay to allow the continuation of this litigation. The trial court held an evidentiary hearing and awarded Trimont and Montgomery attorney's fees of $85,520.50 and conditional attorney's fees in the event of an appeal. The court ordered the sale to proceed – except that the sales price of $200,000 would now be paid in cash (the original contract included seller financing), and the court provided a mechanism for the payment and release of the tax lien out of the sales proceeds.

## II. *Issues*

McCarty alleges that the trial court erred when it granted Trimont's motion for summary judgment seeking specific performance, that it erred when it failed to grant her motion for partial summary judgment, and that it erred when it granted Trimont and Montgomery's motion for summary judgment on her affirmative claims.

## III. *Analysis*

### A. *Standard of Review*.

#### 1. *Traditional Motions for Summary Judgment*.

The standard of review for traditional motions for summary judgment is well settled. Questions of law are reviewed de novo. *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied). To determine if a fact question exists, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). We

4

must consider all the evidence in the light most favorable to the nonmovant, indulging all reasonable inferences in favor of the nonmovant, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

### 2. No-Evidence Motions for Summary Judgment.

No-evidence motions are reviewed under the same standard as a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). Accordingly, we review the evidence in the light most favorable to the nonmovant and disregard all contrary evidence and inferences. *Id.* A trial court must grant a proper no-evidence motion for summary judgment unless the nonmovant produces more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element of the claim. TEX. R. CIV. P. 166a(I).

### B. Was Trimont Entitled to Specific Performance?

To determine the parties' respective rights and obligations, we must interpret their contract. Texas courts have developed rules of interpretation to determine a contract's meaning and canons of construction to determine its legal effect. The rules of interpretation may be utilized to determine if an agreement is ambiguous, but the canons of construction do not apply absent a determination of ambiguity. *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394-95 (Tex. App.— Eastland 2007, no pet.); *see also* Bruce M. Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction*, 24 TEX. TECH L. REV. 1, 110-11 (1993) (canons such as "construe against the grantor" should not replace rational thought when reading a written instrument or be used if the document's language is clear). Neither party contends that the contract is ambiguous or is not fully integrated. We will, therefore, apply the rules of interpretation.

The rules of interpretation include:

1. Construe the agreement as a whole;

2. Give each word and phrase its plain, grammatical meaning unless it definitely appears that such meaning would defeat the parties' intent;

3. Construe the agreement, if possible, so as to give each provision meaning and purpose so that no provision is rendered meaningless or moot;

4. Express terms are favored over implied terms or subsequent conduct; and

5. Surrounding circumstances may be considered – not to determine a party's subjective intent – but to determine the appropriate meaning to ascribe to the language chosen by the parties.

Mark K. Glasser & Keith A. Rowley, *On Parol: The Construction and Interpretation of Written Agreements and the Role of Extrinsic Evidence in Contract Litigation*, 49 BAYLOR L. REV. 657, 664-82 (1997).

McCarty alleges initially that the contract terminated pursuant to its own terms. McCarty reasons that Montgomery objected when he received a copy of the tax lien; that she then had fifteen days to cure; and that, because she did not, his options were to close with the lien in place or terminate the contract and receive a refund of his earnest money deposit. Because he refused to waive his objection and she refused to clear the lien, McCarty contends that the contract terminated. McCarty's position is based upon the following contract provision:

[6.D.] OBJECTIONS: Within 10 days after Buyer receives the Commitment, Exception Documents and the survey,[4] Buyer may object in writing to (I) defects, exceptions, or encumbrances to title: disclosed on the survey other than [the permitted exceptions]; disclosed in the Commitment other than [the permitted exceptions]; (ii) any portion of the Property lying in the 100 year flood plain as shown on the current Federal Emergency Management Agency map; or (iii) any exceptions which prohibit the following use or activity: [none listed]. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived. Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

Montgomery correctly points out that this provision was not triggered because it requires the delivery of a commitment *and* exception documents. Montgomery never received a commitment.

Nor was this provision otherwise triggered by Montgomery's actions because he was not put to an election. When Montgomery was informed of the lien, he made clear his belief that McCarty

---

[4]The contract elsewhere provided that no survey was required.

was required to clear it, and he insisted that she do so. This is not an objection as described in Paragraph 6.D. Grantham testified that the tax lien would have been identified on Schedule C as a lien to be paid at closing. Thus, with or without any action by Montgomery, the commitment would have confirmed his position that the lien was McCarty's responsibility to clear. Because Montgomery was not put to an election, the contract did not terminate.

Nor did McCarty have an option. McCarty does not dispute how the lien would have been identified on the commitment but answers that Montgomery still could not force her to cure an encumbrance. McCarty's obligation to provide clear title and the provision she contends limits Montgomery's remedies are found in the following paragraph:

> 19. REPRESENTATIONS: Seller represents that as of the Closing Date (a) there will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing payment of any loans assumed by Buyer and (b) assumed loans will not be in default. If any representation of Seller in this contract is untrue on the Closing Date, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

If the parties had proceeded to closing, McCarty would have breached this provision by not clearing the tax lien. Montgomery, then, clearly had the right to terminate the contract and receive a refund of his earnest money. However, the contract also contained a default provision, which read:

> 15. DEFAULT: If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, or survey, if required of Seller, Buyer may (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money. If Seller fails to comply with this contract for any other reason, Seller will be in default and buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

McCarty contends that this provision is inapplicable because an untrue representation is not defined as a default. McCarty directs our attention to a subsequent version of the TREC Farm and Ranch contract (TREC No. 25-5) to support her argument. Because this is extrinsic evidence and because the parties do not contend that their agreement is ambiguous or not fully integrated, we may not

7

consider or draw any inference from it. McCarty also argues that, because the representation paragraph is a specific provision and the default paragraph is a general one, we should give preference to the specific provision. That, however, is a canon of construction applicable only when two or more reasonable readings of a contract remain in irreconcilable conflict after applying the rules of interpretation. *See* Glasser, 49 BAYLOR L. REV. at 683, 686.

The representation paragraph's language does not indicate that the parties intended termination to be Montgomery's exclusive remedy if McCarty failed to deliver clear title. For example, it does not contain language such as "exclusive" or "sole" remedy. Instead, termination is described permissively, "Buyer may terminate this contract." We recognize that the mere presence of the word "may" is not determinative. For example, if the paragraph had provided that buyer may choose one of three options in the event of a false representation, this would indicate that Montgomery's remedies were limited to those three options. However, the representation paragraph contains no such list. We appreciate McCarty's argument that implicit within the paragraph's language is the choice of accepting the title offered or terminating the contract, but this interpretation is inconsistent with the construction of the remainder of the contract.

There are three contractual provisions to consider and, if possible, to harmonize. Paragraph 6 provides a mechanism for determining and insuring title,[5] Paragraph 15 lists the remedies for defaults by either party, and Paragraph 19 defines McCarty's representations at closing and provides at least a partial description of Montgomery's remedies for a misrepresentation. We have previously noted that McCarty was required to deliver title free and clear of the tax lien without any predicate action by Montgomery. The significance of this is that, if the lien were a title-related issue Montgomery was required to object to and if his objection were not cured, the contract provides: "[T]his contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections."

By specifying a mandatory remedy for title-related matters requiring an objection, the import is that matters not requiring an objection will be treated differently. This is not an illogical distinction. McCarty made limited representations concerning her title. The contract provided a process to clarify what McCarty owned and was conveying. If that process revealed title-related

---

[5]For an example of this provision in practice, see *Fawcett, Ltd. v. Idaho Northern & Pacific Railroad Co.*, No. 11-07-00154-CV, 2009 WL 1349988 (Tex. App.—Eastland May 14, 2009, n.p.h.).

8

issues and if the parties were unable to reach an agreement on their resolution, termination is consistent with the notion that there was not a meeting of the minds in the first instance. However, delivery of title free and clear of any third-party lien is substantively different because McCarty specifically represented that any such lien would be cleared at closing. The parties identified a remedy for breach of this representation, but unlike the objection provision, (Paragraph 6.D.), they did not describe it as exclusive. And unlike the default provision, (Paragraph 15), the representation paragraph does not enumerate a list of options and require a choice amongst them.

Montgomery could have terminated the contract, but because this was not his exclusive remedy, he was also entitled to the default paragraph remedies, including specific performance. This interpretation gives meaning to each of the contract's provisions, is consistent with the intent of the parties as expressed in the agreement as a whole, and is consistent with the surrounding circumstances. First, McCarty may not have had actual knowledge of the IRS lien on her property when she signed the contract and represented that clear title would be delivered at closing, but she did have constructive knowledge since that lien was part of her chain of title. Second, the contract provided a place to list exception documents. Any listed document would be a permitted exception in the title policy and would not be a basis for objection to title. McCarty could, therefore, have conditioned the purchase upon Montgomery's assumption of the tax lien. Third, if we accept McCarty's construction, then any seller who has a change of heart after signing a contract need only pledge their property as collateral for some other obligation prior to closing. The buyer would then be forced to assume this new debt or terminate the contract, and the seller would have no fear of recourse.

The trial court did not err by finding that specific performance was a permissible remedy.

*C. Was the Contract Unenforceable?*

McCarty argues that, regardless of what remedy might be available, the contract is unenforceable because of a lack of mutuality and because it is an option contract. The contract allowed Montgomery to cancel the agreement if McCarty was "determined to own less than an undivided one half (½) of the oil, gas, and other minerals in, on, and under the land above described." McCarty contends that Montgomery knew Trimont had acquired a portion of the property by adverse possession and, therefore, that McCarty did not own one-half of the minerals.

9

Because Montgomery had the unilateral right to cancel the agreement, his obligations were illusory. Alternatively, his unilateral right to cancel made the agreement an unenforceable option agreement.

A contract must be based upon valid consideration. *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 645 (Tex. 1994), *modified by Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006). An illusory promise of performance invalidates a bilateral contract. *Light*, 883 S.W.2d at 645. A promise is illusory when if fails to bind the promisor who retains the option of discontinuing performance. *Id.* In fact, an illusory promise is no promise at all. *See* 1 ARTHUR LINTON CORBIN, *Corbin on Contracts* § 1.17 (rev. 1993).

Montgomery's promises were not illusory. Trimont owns property contiguous to McCarty's. Prior to Trimont or McCarty acquiring their interests, a fence was installed between their tracts, but it was not located on the boundary line. Instead, the fence cut diagonally across the boundary line. Montgomery testified that Trimont may have acquired a portion of McCarty's property through adverse possession and, conversely, that McCarty may have acquired a portion of Trimont's property through adverse possession.

The contract's use of the word "determined" suggests more definitive or official action than Montgomery's own personal thought process; nonetheless, he merely recognized this as a possibility. By proceeding with the sale, he and McCarty were resolving a potential title dispute and were both waiving the right to claim title by adverse possession to any portion of the other's property. The agreement, therefore, was supported by adequate consideration. The trial court did not err when it granted Trimont's motion for summary judgment on specific performance and when it denied McCarty's motion for summary judgment.

*D. Did the Trial Court Erroneously Describe the Property to be Conveyed?*

The contract described the property as follows:

Undivided half (50%) interest in both the surface and the mineral estates in the following described land: 950.3 Acres consisting of 170.3 Acres in Abstract 2057 TR 1-1 C Melton, 140 Acres in Abstract 2073 TR 2-1 BL Caudill, and 640 Acres in Abstract 1057 TR 1-1 Poitevent.

The trial court ordered McCarty to convey the following property:

Annette McCarty's undivided one-half (50%) interest in the surface and mineral estates in and to 950.3 acres located in Palo Pinto County, Texas, consisting of 170.3

Acres in Abstract 2057 TR 1-1 C Melton, 140 Acres in Abstract 2073 TR 2-1 BL Caudill (which 140 acres includes all of the J.M. Morton & R.H. Morton Survey, A-2187, containing 41.5 acres, more or less), and 640 Acres in Abstract 1057 TR 1-1 Poitevent.

The difference between the two descriptions is the parenthetical in the judgment referencing 41.5 acres in the Morton Survey. McCarty argues that the trial court's judgment requires the conveyance of an additional forty-one acres. Strictly speaking, McCarty cannot be correct. The contract conveys an undivided 50% interest in 950.3 acres, and the judgment requires McCarty to convey an undivided 50% interest in 950.3 acres. The question is whether the 140 acres in Abstract 2073 described in the contract is the same 140 acres in Abstract 2073 described in the judgment.

There is no evidence that McCarty owns more than 140 acres in Abstract 2073. In her deposition, she was asked:

Q.      Okay. After inheriting the -- well, let me ask, is that -- is this the only property you own in Palo Pinto County, or do you own any other property in Palo Pinto County?

A.      That's the -- that's all.

Q.      Okay. And as you understand it, it's approximately 950 acres?

A.      Yes.

McCarty accuses Montgomery of misrepresenting to this court that the contract covered all of the real property she owns in Palo Pinto County, and she contends that her testimony was only a general discussion that did not inquire into the property described in the contract. We agree that McCarty's testimony was part of a general discussion but disagree with her conclusion. Her testimony is clear that the 950 acres she inherited from her grandmother is the only property she owns in Palo Pinto County. Because she agreed to sell 950.3 acres, it follows that the contract conveyed all of her Palo Pinto County real property.

McCarty correctly points out that, subsequent to the contract's execution, Montgomery attempted to amend the contract's property description. Montgomery sent Hortenstine a letter and offered to amend the contract by increasing the down payment from $55,000 to $70,000 in exchange for lengthening the term of the note from 12 to 15 years. Montgomery also wrote:

In the contract there was an irregularity in the description of the Caudill Survey area which resulted from a vacancy on the East that was patented to the

11

Morton Bros. AND from some of the survey on the North having been sold off to H.C. Moore et ux, the parents of Mrs. Edna Crumpton. These matters have been discussed with Neal Grantham, and I see no need to meet Thursday A.M. (tomorrow) after all.

The letter included a proposed contract amendment. That document contained a property description. Rather than organized by abstract, the description was organized by tract. Tract One was the 640 acres in Abstract 1057, and Tract Two was the 170.3 acres in Abstract 2057. Tracts Three and Four were described as:

THIRD TRACT: All of the J.M. Morton & R.H. Morton Survey, A-2187, containing 41.5 acres, more or less.

FOURTH TRACT: 99.5 acres, more or less, out of the B.L. Caudill Survey (sometimes called W.L. Ainsworth Survey), A-2073, and being all of said survey, SAVE AND EXCEPT the portion heretofore sold off to H.C. Moore and wife, Mary Moore, by E.B. Pickard et al.

If the correctness of the property description were decided by summary judgment, this would be sufficient evidence to create a fact question. The contract references 140 acres in Abstract 2073, but the proposed amendment refers to only 99.5 acres, the third tract is described by a survey and abstract not contained in the contract, and the third and fourth tracts constitute 141 acres – one more than described in the contract. However, Montgomery's letter does not establish that McCarty owned additional, unconveyed property; the trial court did not use this property description; and McCarty's position does not account for the trial court's hearing to enter judgment.

After the trial court granted Trimont's motion for summary judgment seeking specific performance, it held an evidentiary hearing to determine attorney's fees and the manner in which the contract should be performed. The property description was not discussed during that hearing. The trial court ruled on attorney's fees, discussed the closing process, and asked the parties to work on an agreed judgment. The parties were unable to reach an agreement. Montgomery prepared a proposed judgment, and McCarty objected, contending that the judgment's property description was inconsistent with the contract's property description. McCarty also asserted that she had not contracted to sell all of her property in Palo Pinto County, and she objected to any order requiring her to do so. The trial court held another hearing and then entered a final judgment. That hearing was not transcribed, but the trial court made findings of fact and conclusions of law. The trial court found that Trimont presented the court with copies of maps, field notes, and ad valorem tax records

reflecting that the 140 acres in Abstract 2073 includes all of the 41.5-acre Morton Survey. Accordingly, the trial court found that these 41.5 acres were included in the contract's property description.

McCarty disputes whether a subsequent hearing was held, contending that there is no record of one. There is no transcript from that hearing, but the record confirms that the trial court did hold a hearing in chambers on June 28. On June 5, McCarty's counsel wrote Montgomery's counsel and advised him that the hearing on entry of judgment had been moved from June 8 to June 28. On June 28, McCarty's counsel sent Montgomery's counsel another letter and said: "I received your proposed Final Judgment by fax. I reviewed it in light of the Judge's statements today in chambers." Finally, the trial court's findings of fact reflect that a hearing was held in chambers on June 28.

The trial court did not err when it described the property to be conveyed. The record adequately supports the conclusion that the property conveyed in the contract and the property described in the judgment are the same and that the additional language referencing the Morton Survey merely clarified the property's description.

*E. Findings of Fact.*

McCarty next complains that the trial court's findings of fact are not supported by the evidence. After the trial court entered its final judgment, McCarty requested findings of fact and conclusions of law regarding the trial court's hearing to determine attorney's fees and the equitable manner for specific performance. The trial court entered findings of fact and conclusions of law, but most of those dealt with matters covered in the subsequent hearing to enter judgment. McCarty complains that these additional findings have no support in the record because the docket sheet and final judgment contain no reference to a hearing or decision made at the conclusion of that hearing.

The trial court was not required to contemporaneously document any conclusions reached at the June 28 hearing. The judgment and findings of fact indicate that the court considered evidence on the appropriate property description at this hearing. We cannot review the sufficiency of this evidence because no record was made. TEX. R. APP. P. 13.1 requires the court reporter to make a full record of all proceedings and to take all exhibits offered in evidence, unless excused by agreement of the parties. The trial court's findings indicate that both parties waived a record. If that is correct, McCarty may not complain now about the adequacy of the evidence offered during that hearing. *See Long v. Long*, 144 S.W.3d 64, 69 (Tex. App.—El Paso 2004, no pet.). If that is incorrect, McCarty was required to object to the lack of a court reporter by filing a motion or other

written objection. *Reyes v. Credit Based Asset Servicing & Securitization*, 190 S.W.3d 736, 740 (Tex. App.—San Antonio 2005, no pet.). Because no objection was made, any error was waived.

### F. McCarty's Affirmative Claims for Relief.

McCarty contends that the trial court erred by granting summary judgment on her affirmative claims for relief because she presented sufficient evidence to create questions of fact. McCarty alleged that Montgomery intentionally caused her to suffer extreme emotional distress when he accused her of criminal misconduct and when he obtained an affidavit from her by misrepresentation. McCarty testified that, during a conversation, Montgomery "asked me about the oil and gas lease. He asked me if I signed it, and I said, 'Yes,' and he said, 'That's criminal.'" She later met with Montgomery and his attorney at Luby's. During this meeting, she was given an affidavit. She read it and signed it but contended that Montgomery and his counsel misrepresented what the affidavit said about Montgomery's right to move forward with the closing. McCarty testified that she was led to believe that she and Hill Operating had done something criminal by signing the oil and gas lease. She testified that this has caused her to worry. She described her situation as being "in a constant emotional turmoil about – or not constant, but periodic turmoil about it."

McCarty's testimony is insufficient to create a fact question on either liability or damages. The elements of an intentional infliction of emotional distress claim are (1) the defendant acted intentionally and recklessly, (2) the conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the plaintiff's emotional distress was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621-22 (Tex. 1993). It is for the court to determine in the first instance whether conduct is extreme and outrageous. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817-18 (Tex. 2005). Extreme and outrageous conduct is conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* Generally, insensitive or rude behavior, insults, indignities, threats, annoyances, and petty oppressions do not rise to the level of extreme and outrageous conduct. *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999). McCarty's evidence, even when viewed in her favor, does not rise to the level of extreme and outrageous conduct required to constitute a cause of action.

The requirement that the emotional distress be severe means that the distress is so severe that no reasonable person could be expected to endure it without undergoing unreasonable suffering. *Id.* at 618. This requires proof of more than mere worry, anxiety, vexation, embarrassment, or anger.

14

*Id.* Because McCarty testified to no more than periodic turmoil, she also failed to establish compensable damages. The trial court did not err by granting summary judgment on her intentional infliction of emotional distress claim.

McCarty also asserted claims for misrepresentation and tortious interference with contract. McCarty claimed that the affidavit Montgomery filed in the real property records of Palo Pinto County concerning the purchase agreement misrepresented the status of title, caused her to lose her tax exemption, and prevented her from selling her property. She also claimed that Montgomery executed an agreement with Hill Operating that voided and released the lease agreement between herself and Hill Operating.

McCarty cites no evidence that Montgomery made any representation to the taxing authorities. McCarty also cites no evidence that Montgomery's actions, as opposed to the tax lien, prevented her from selling the property to any other party. Because we have found that Trimont was entitled to specific performance, any representation about its ability to proceed to closing was, in fact, true. The trial court, therefore, did not err by granting summary judgment on McCarty's misrepresentation cause of action.

McCarty's tortious interference claim is predicated upon a letter agreement between Montgomery and Hill Operating. They agreed that, when Montgomery became entitled to McCarty's interest, her leases would become void, be released, and be replaced with a new agreement. McCarty argues that this constitutes tortious interference with contract because it interferes with her leases with Hill Operating. We disagree because the letter agreement is predicated upon Montgomery becoming entitled to McCarty's interest. Until then, it has no impact on her rights under the mineral leases. The trial court did not err by granting summary judgment on McCarty's tortious interference cause of action.

Finally, McCarty asserted a cause of action for slander of title. This cause of action is based upon the statement in Montgomery's affidavit that he had the right to insist upon specific performance of the contract. Because that statement is true, no cause of action for slander of title lies, and the trial court did not err by granting summary judgment on it.

*G. Attorney's Fees.*

The trial court awarded Trimont attorney's fees of $85,520.50 through trial and conditional awards in the event of an appeal. McCarty argues that the trial court abused its discretion with this award because the evidence provided no segregation of the fees between the parties and provided

15

no evidence or insufficient evidence as to the segregation of the attorney's fees between the various claims.

Trimont's counsel testified that reasonable and necessary attorney's fees through the summary judgment process were $65,115, that reasonable and necessary attorney's fees in bankruptcy court proceedings were $24,349.50, and that reasonable and necessary attorney's fees through his testimony were $1,056, for a total of $90,520.50. Counsel testified that McCarty had filed several counterclaims after Trimont filed suit for specific performance but that he viewed these as an effort to defeat Trimont's ability to recover for specific performance and that the issues were integrally related and intertwined. Counsel testified that approximately $5,000 of time was spent dealing with the issues for which attorney's fees were not recoverable. McCarty offered no evidence but asked the court to take judicial notice from its experience as to reasonable and necessary attorney's fees. The trial court found that the claims were "close to being inextricably intertwined. But in view of counsel's efforts to segregate, and in the exercise of caution, I'm going to diminish the requested award by $5,000."

A determination of reasonable attorney's fees is a question for the trier of fact. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 12 (Tex. 1991). The amount of a fee award rests in the sound discretion of the trial court, and its judgment will not be reversed on appeal absent a clear abuse of discretion. *Cordova v. Sw. Bell Yellow Pages, Inc.*, 148 S.W.3d 441, 446-47 (Tex. App.—El Paso 2004, no pet.). Even though the appropriate standard of review is abuse of discretion, we may nevertheless review a fee award for sufficiency of the evidence. *Stewart Title*, 822 S.W.2d at 11.

When legal services advance both recoverable and unrecoverable claims, the associated fees need not be segregated. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006). The need to segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Id*. at 312-13. The trial court was well familiar with the issues, having presided over the parties' cross-motions for summary judgment. From our work on this appeal, it is apparent that McCarty's affirmative claims are intertwined with Trimont's right to specific performance. The trial court did not abuse its discretion when it found that all but $5,000 of Trimont's fees and expenses were recoverable.

16

## IV. *Holding*

The judgment of the trial court is affirmed.


RICK STRANGE

JUSTICE


June 11, 2009

Panel consists of:  Wright, C.J.,
McCall, J., and Strange, J.