# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 13, 2013

No. 11-41408

Lyle W. Cayce
Clerk

TEKELEC, INC.,

Plaintiff - Appellee

v.

VERINT SYSTEMS, INC.,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, ELROD, and HAYNES,[*] Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal arises out of a contract dispute between Verint Systems, Inc. ("Verint") and Tekelec, Inc. ("Tekelec"). The district court awarded summary judgment to Tekelec and denied Verint's cross-motion for summary judgment. We affirm.

---

[*] Concurring in the judgment only.

No. 11-41408

## I.

The facts of this case begin with a patent dispute between two corporate entities not directly involved in this appeal, Blue Pumpkin Software, L.L.C. ("Blue Pumpkin"), and IEX Corporation ("IEX"). In 2001, IEX—which was, at the time, a wholly owned subsidiary of Tekelec—filed suit against Blue Pumpkin for allegedly infringing U.S. Patent No. 6,044,355 (the "'355 Patent"). In 2005, Blue Pumpkin commenced its own infringement action against IEX. In April 2006, Blue Pumpkin and IEX executed the Blue Pumpkin/IEX Settlement & Cross-License Agreement ("Blue Pumpkin/IEX Agreement") to resolve their ongoing patent dispute.[1] Under Section 2 of the Agreement, entitled "Settlement and Dismissal of Litigations," Blue Pumpkin and IEX agreed to settle the two pending infringement actions between them. The only condition to settlement was Blue Pumpkin's payment of an $8,250,000 lump sum fee, on or before April 7, 2006.

Under Section 6.1.2, which creates the right to payment that Tekelec seeks to enforce in this appeal, Blue Pumpkin agreed that beginning on April 1, 2007, it would make six annual payments of $500,000 to IEX (the "Section 6.1.2 Payments"). The Payments are listed under the heading "License Fee/Balancing Payment." No provision of the Blue Pumpkin/IEX Agreement makes the settlement set forth in Section 2 contingent on Blue Pumpkin's timely tender of the Section 6.1.2 Payments.

Finally, under Section 4.3, IEX granted Blue Pumpkin an "irrevocable, perpetual" license in its '355 Patent. However, under Section 4.3.5, IEX reserved the right to terminate the license "upon Blue Pumpkin's failure to make any of the payments set forth in Section 5.1.2" (the "Termination Provision"). As there is no Section 5.1.2 in the Agreement, and as Section 5 contains no reference to

---

[1] *See* Appendix, No. 1.

2

No. 11-41408

payments, the parties presumably intended the Termination Provision to refer to the aforementioned Section 6.1.2 Payments.

In accordance with the terms of the Blue Pumpkin/IEX Agreement, Blue Pumpkin timely paid IEX the initial settlement fee of $8,250,000, and pursuant to Section 2 of the Agreement, the parties dismissed their infringement actions with prejudice. Shortly after Blue Pumpkin and IEX executed the Agreement, Tekelec sold IEX to NICE Systems, Inc. ("NICE")—an entity not party to this appeal—in a stock purchase agreement. However, under the separate Assignment of Royalty Rights Agreement ("Royalty Assignment Agreement"), executed at the same time NICE finalized its acquisition of IEX, IEX assigned its right to the six Section 6.1.2 Payments to Tekelec.[2] In the instrument of assignment, IEX also promised that it "would not terminate the [Blue Pumpkin/IEX Agreement] without [Tekelec's] written permission," and that it would "provide reasonable assistance to [Tekelec] to facilitate the resolution of any failure of Blue Pumpkin" to timely make any of the six Section 6.1.2 Payments due under the Blue Pumpkin/IEX Agreement.

At some point after IEX assigned its right to the Section 6.1.2 Payments to Tekelec but before the first payment came due, Witness Systems, Inc.—also not a party to this appeal—assumed all of Blue Pumpkin's rights and obligations under the Blue Pumpkin/IEX Agreement, including the license in IEX's '355 Patent as well as the obligation to make the six Section 6.1.2 Payments to Tekelec. In accordance with its obligations, Witness timely made the first $500,000 payment to Tekelec on April 1, 2007. In May 2007, Verint, the appellant in this case, acquired Witness, assuming all of its rights and

---

[2] *See* Appendix, No. 2.

No. 11-41408

obligations under the Blue Pumpkin/IEX Agreement.[3]  On April 1, 2008, Verint timely made the second $500,000 payment to Tekelec.

At this time, Verint was embroiled in its own patent dispute with NICE, involving five separate infringement actions and dozens of patents.  In August 2008, Verint and NICE entered into the Verint/NICE Settlement Agreement and Covenant Not to Sue ("Verint/NICE Settlement") to resolve their ongoing patent disputes on a global, portfolio-wide basis.[4]  Both parties recited that they were entering into the Settlement to "compromise, settle, discharge, and resolve, fully and finally," all claims for patent infringement then pending or assertable between them.

In furtherance of this objective, NICE agreed, both on behalf of itself and its subsidiaries, not to initiate or prosecute any infringement actions against Verint on any and all patents then held by NICE or its subsidiaries (the "Covenant Not to Sue").  The Covenant Not to Sue would begin on August 1, 2008 and terminate on a patent-specific basis, as set forth in the Settlement. Moreover, NICE agreed, both on behalf of itself and its subsidiaries, that "any royalties or other patent damages that may have otherwise accrued" against Verint during the pendency of the Covenant Not to Sue on any and all patents held by NICE or its subsidiaries "shall not accrue as to [Verint]" (the "Non-Accrual Clause").  Verint made mirror-image promises to NICE.

On April 1, 2009—eight months after the effective date of the Verint/NICE Settlement—Verint timely made the third $500,000 Section 6.1.2 payment to Tekelec.  However, after that date, Verint made no further payments, claiming that the Non-Accrual Clause in the Verint/NICE Settlement extinguished its obligations to Tekelec.  Tekelec sued Verint for breach in the Eastern District of

---

[3] *See* Appendix, No. 3.

[4] *See* Appendix, No. 4.

No. 11-41408

Texas. In its answer, Verint counterclaimed to recover the April 1, 2009 payment, which it alleged it had made in error. The district court awarded summary judgment to Tekelec, denied Verint's cross-motion for summary judgment, and ordered Verint to pay up. Verint appeals.

## II.

Verint claims that Tekelec lacks constitutional standing to enforce its right to the remaining three Section 6.1.2 Payments, offering three related theories as to why it is not party to an enforceable agreement with Tekelec. Though couched in terms of Article III, Verint's theories of non-liability really go to the merits of whether an enforceable agreement exists, and we address them as such. Because this case is before us on the parties' cross motions for summary judgment, we review *de novo*, asking whether the evidence leaves no genuine issue as to any material fact and shows that Tekelec is entitled to judgment as a matter of law.[5] The enforceability of a contract is a legal question that is proper subject matter for summary judgment.[6]

Verint first argues that IEX assigned to Tekelec only the "limited and discrete right to receive" the Section 6.1.2 Payments, not the power to *enforce* the Payments as against Blue Pumpkin or its assigns. But under Texas law, a promise to pay becomes binding if it meets certain formation requirements

---

[5] *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 313 (5th Cir. 2007).

[6] *See Westlake Petrochems., L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 238–39 (5th Cir. 2012) (citing *Martin v. Martin*, 326 S.W.3d 741, 747 (Tex. App. 2010)). Texas law governs the enforceability and interpretation of the Blue Pumpkin/IEX Agreement, for two independently sufficient reasons. First, "[w]e apply Texas law to the enforcement of settlement agreements in Texas diversity cases." *See Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 266 (5th Cir. 2005). Second, the Agreement designates Texas law as controlling. We give effect to such a choice-of-law provision unless a party can show that it is "unreasonable under the circumstances." *Ginter ex. rel. Ballard v. Bletcher, Prendergast & Laporte*, 536 F.3d 439, 449 (5th Cir. 2008).

No. 11-41408

Verint does not challenge here; there is no additional requirement that the promise be accompanied by an express grant of enforcement authority, either when first made to the promisee,[7] or when assigned by the promisee to a third party.[8]  As IEX validly assigned its right to the Section 6.1.2 Payments to Tekelec, and as Tekelec thereby "stepp[ed] into [IEX's] shoes" with respect to Blue Pumpkin's promise to make the Payments,[9] Tekelec has the right to enforce the Payments against Blue Pumpkin's successor Verint.

Verint next suggests that IEX *itself* did not have the right to enforce the Section 6.1.2 Payments, and that Tekelec, as assignee, can have no greater rights than IEX.  Verint apparently reasons that because the Termination Provision in the Blue Pumpkin/IEX Agreement gave IEX the right to terminate Verint's license in the '355 Patent if Blue Pumpkin or its assigns failed to timely tender the Section 6.1.2 Payments, the Termination Provision was necessarily IEX's exclusive remedy for nonpayment.  But as Tekelec points out in its brief, this argument "misses the obvious additional enforcement right inherent with *any* contract: the right to sue for breach."  Under Texas contract law, "[a] construction which renders [a] specified remedy exclusive should not be made unless the intent of the parties that it be exclusive is *clearly* indicated or declared."[10]  In this case, there is no language in the Blue Pumpkin/IEX

---

[7] *See generally* 49 DAVID R. DOW & CRAIG SMYSER, TEXAS PRACTICE SERIES: CONTRACT LAW § 1 (West 2012) (surveying the requirements for contract formation).

[8] *See, e.g.*, *Thweatt v. Jackson*, 838 S.W.2d 725, 728 (Tex. App. 1992) ("[I]t is axiomatic that an assignee . . . stands in the shoes of the assignor and obtains the rights, title, and interest that the assignor had at the time of the assignment.  Moreover, the assignee of a debt ordinarily obtains all remedies which were available to the assignor against the debtor for the enforcement of the obligation.").

[9] *Thweatt*, 838 S.W.2d at 728.

[10] *Bifano v. Young*, 665 S.W.2d 536, 539 (Tex. App. 1984) (emphasis in original) (citations omitted); *see also McCarty v. Montgomery*, 290 S.W.3d 525, 534 (Tex. App. 2009) (holding that in order for a termination provision to be construed as the exclusive remedy, it

No. 11-41408

Agreement that suggests—let alone "*clearly* indicate[s]" —that the Termination Provision was to serve as IEX's exclusive remedy for nonpayment.  IEX retained the right to sue for nonpayment, and Tekelec succeeded to that right by virtue of the assignment.

Finally, Verint claims that "IEX retained the right to terminate the [Blue Pumpkin/IEX Agreement]," and that "it would be entirely inconsistent to allow Tekelec to sue for the non-payment of royalties that IEX was entitled to extinguish."  Verint points to no specific provision in the Blue Pumpkin/IEX Agreement that gives IEX the unilateral right to terminate the Agreement; rather, it argues that under the separate Royalty Assignment Agreement between IEX and Tekelec, IEX promised that it would *not* terminate the Blue Pumpkin/IEX Agreement.  Verint reasons that unless IEX had a unilateral termination right, "there would have been no reason for Tekelec and IEX to include the non-termination covenant in the Royalty Assignment Agreement."

Verint's argument is flawed, for three reasons.  First, the Royalty Assignment Agreement is extrinsic evidence that cannot be used to prove that IEX has a unilateral termination right never mentioned in the Blue Pumpkin/IEX Agreement.[11]  Second, the non-termination provision in the Royalty Assignment Agreement is not rendered superfluous if IEX lacks an affirmative termination right, as the provision still protects Tekelec from the risk that IEX could terminate the Agreement *without* an affirmative right to do so (which might excuse Blue Pumpkin or its assigns from making the Section

---

must contain either language making termination the "sole" or "exclusive" remedy, or language expressly limiting remedies to a discrete number of choices).

[11] *See, e.g.*, *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008) ("[W]e must give [a contract's] words their plain meaning, without inserting additional provisions into the contract.").  Though the Agreement does give IEX the right to terminate the license in the '355 Patent *if* Blue Pumpkin or its assigns fail to timely make the Section 6.1.2 Payments, nothing in the Agreement gives IEX a unilateral right to terminate.

No. 11-41408

6.1.2 Payments to Tekelec).  Third, even assuming that IEX does have the unilateral right to extinguish the Section 6.1.2 Payments, that right is not "inconsistent" with Tekelec's right to enforce the Payments against Verint unless IEX *actually extinguished* the Payments—the central issue disputed in this case.  So long as IEX has not extinguished the Payments, Verint's obligation to make the Payments remains, as does Tekelec's right to sue for nonpayment.

## III.

Having determined that Tekelec has the power to enforce the Blue Pumpkin/IEX Agreement against Verint, we turn to Verint's claim that the subsequent Verint/NICE Settlement extinguished its obligation to make the disputed Section 6.1.2 Payments.  We again apply the same summary judgment standard as the district court. The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.[12] However, if a contract's terms are ambiguous, summary judgment is generally inappropriate.[13]

Verint's argument is relatively simple: Under the Non-Accrual Clause of the Verint/NICE Settlement, NICE agreed, on behalf of IEX, to extinguish all "royalties or other patent damages that may have otherwise accrued" against Verint on IEX's '355 Patent at any point after August 1, 2008 and throughout the pendency of the Covenant Not to Sue.[14]  According to Verint, the parties to

---

[12] *Boudreaux v. Unionmutual Stock Life Ins. Co. of Am.*, 835 F.2d 121, 123 (5th Cir. 1988).

[13] *Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 289 (5th Cir. 1984).

[14] Verint's construction of the Settlement on this point is correct, but requires a close reading of the contract.  The Non-Accrual Clause extinguishes all "royalties or patent damages" that "would have otherwise accrued against Verint [during the term of the Covenant Not to Sue] with respect to the NICE Patents [and] the Non-Asserted Nice Patents." Section 3.4 defines "Non-Asserted NICE Patents" to include "any patent . . . owned or controlled by VERINT or a Subsidiary," and Section 5.1 specifies that the Covenant Not to Sue commences

8

No. 11-41408

the Blue Pumpkin/IEX Agreement intended the Section 6.1.2 Payments to serve as "royalties" for Blue Pumpkin's (and eventually Verint's) license in IEX's '355 Patent. Consequently, Verint reasons, because the last four Section 6.1.2 payments "accrued" after August 1, 2008, NICE has, on behalf of IEX, extinguished Verint's obligation to make those payments.

Tekelec disagrees, urging that the parties to the Blue Pumpkin/IEX Agreement did not intend the Section 6.1.2 Payments to serve as "royalties" for the '355 Patent, but merely as a deferred component of the price Blue Pumpkin paid to settle IEX's claims for past infringement. According to Tekelec, "Verint's argument that the up-front $8.25 million constituted the consideration for the settlement and release, and that the [Section 6.1.2 Payments] were tied only to the continuing license to the ['355 Patent], has no basis or support from the plain language of the [A]greement."

Perhaps Verint is correct that the parties to the Blue Pumpkin/IEX Agreement intended the Section 6.1.2. Payments to serve as fees for the license in IEX's '355 Patent,[15] but this argument misses the point. The principal question presented by this appeal is not whether the Payments serve as "royalties" in some abstract, economic sense, but whether they fall within the scope of the "royalties or other patent damages" extinguished by the Non-Accrual Clause in the subsequent Verint/NICE Settlement. We think they do not.

_____

on August 1, 2008. Section 3.1 defines the term "Subsidiary" in a manner that includes IEX, a wholly-owned subsidiary of NICE. IEX owns the '355 Patent.

[15] As Verint observes, the Agreement provides that the *only* condition to the settlement of past claims is Blue Pumpkin's timely payment of the initial $8,250,000 lump sum; nothing in the Agreement makes the settlement contingent on Blue Pumpkin's tender of the Section 6.1.2 Payments. Moreover the Agreement ties the Section 6.1.2 Payments to Blue Pumpkin's (now Verint's) license in IEX's '355 Patent by giving IEX the right to terminate the license if Blue Pumpkin (now Verint) fails to timely make any of the Section 6.1.2 Payments. Finally, the Agreement sets forth the Payments under the heading "License Fee/Balancing Payment."

No. 11-41408

Under Texas law, the words of a contract must be read in context,[16] and technical or legal terms of art must be given their technical or legal meaning.[17] Here, the Non-Accrual Clause extinguishes "royalties or other patent damages that may have otherwise accrued" against Verint on all patents held by NICE and its subsidiaries during the pendency of the Covenant Not to Sue. We read the qualifying phrase "or *other patent damages*" to indicate that the term "royalties" refers not to Verint's contractually bargained-for payment obligations under Section 6.1.2 of the Blue Pumpkin/IEX Agreement, but to the court-ordered "reasonable royalties" that serve as the generally accepted measure of patent damages under 35 U.S.C. § 284.[18] Our reading is bolstered by the immediately succeeding phrase "that *may* have otherwise accrued," which

---

[16] *See, e.g.*, *United States Fid. and Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008) ("Under the traditional canon of construction *noscitur a sociis* ('a word is known by the company it keeps'), each of the words used [in the insurance contract at issue] here must be construed in context."); *see also* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32:6 (4th ed. 1999 & Supp. 2009) ("The context and subject matter of a contract may indicate that an ordinary word or phrase has an unusual meaning in a given sentence. . . . The ancient maxim *noscitur a sociis* summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words.").

[17] *E.g., Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 355 (Tex. App. 2000) ("Where the words used have a technical or legal meaning and there is nothing in the deed, when construed as a whole, to show that any other meaning was intended, they will be given their legal meaning."); *see also* LORD, *supra* note 16, at § 32:4 ("Technical terms or words of art will be given their technical meaning [unless] the circumstances or context show that the parties intended a [different] meaning.").

[18] Under § 284, courts are empowered to award a patent holder "damages adequate to compensate for [an] infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interests and costs as fixed by the court." *See* 35 U.S.C. § 284. "Reasonable royalty" awards under § 284 are distinguishable from contractual royalty arrangements, both practically and conceptually. As a practical matter, § 284 awards are court-mandated, not bargained for. As a conceptual matter, courts have acknowledged that "[t]he setting of a reasonable royalty after infringement cannot be treated . . . as the equivalent of ordinary royalty negotiations among truly 'willing' patent owners and licensees," as "[t]hat view would . . . make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner." *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).

10

No. 11-41408

reinforces the conclusion that the phrase "royalties or other patent damages" refers not to the fixed Section 6.1.2 Payments, but to the *potential* patent damages a court might find accrued against Verint on patents held by NICE or its subsidiaries during the pendency of the Covenant Not to Sue.[19] In the absence of the Non-Accrual Clause, NICE could conceivably recover such accrued damages by breaching the Covenant or suing after the Covenant expired.[20]

Even if we *were* presented with the question of how to characterize the Section 6.1.2 Payments in the abstract, the Payments do not present in the most common form of "royalty." We can assume without deciding that the parties to the Blue Pumpkin/IEX Agreement intended the Payments to serve as fees for the license in IEX's '355 Patent. But a "royalty" is generally defined as a payment that fluctuates with the licensee's actual usage of the licensor's intellectual property, such as a payment based on the number of patented

---

[19] *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 148 F.3d 1343, 1354 (Fed. Cir. 1998) ("[U]nder the federal patent law, damages begin to accrue at the time that the alleged infringer receives notice of infringement, either through a marked product or directly from the patentee.").

[20] *See* 12 RICHARD A. LORD, WILLISTON ON CONTRACTS § 36:16 (4th ed. 1999 & Supp. 2009) ("A covenant not to sue for a limited time does not suspend or affect in any other way the covenantor's right to sue, [and] the covenantee's only remedy is by an action for damages for breach of the covenant."); *Core Labs., Inc. v. Hayward-Wolff Research Corp.*, 136 A.2d 553, 571 (Del. 1958) (holding that the effect of a covenant not to sue for a limited period of time was merely "to postpone [the patent holder's] claim against [the defendant] for infringement" until the covenant expired); *see also Samsung Elecs. Co., Ltd. v. Rambus, Inc.*, 440 F. Supp. 2d 495, 504 (E.D. Va. 2006) ("If [the patent-holder] breached the covenant not to sue by asserting an infringement claim . . . , its suit would not fail for lack of jurisdiction. Whether the covenant not to sue could be pleaded as an affirmative defense, in addition to forming the basis for a breach of contract action, would have to be litigated."); *cf.* Robert H. Mnookin et al., *"Hard-Bargaining" and "Over-Lawyering": Common Pitfalls in Constructing a Deal*, 18 ALTERNATIVES TO HIGH COST LITIG. 171 (2000) (observing that transactional attorneys often "waste the client's time and money by focusing on small or unlikely risks that do not justify contractual planning.").

11

No. 11-41408

articles sold.[21]  A fixed-fee licensing arrangement such as the one at issue here is conceptually distinct from a royalty.[22]

Because we conclude that Verint's fixed, contractual payment obligations under the Blue Pumpkin/IEX Agreement unambiguously fall outside of the scope of the subsequent Verint/NICE Settlement's boilerplate Non-Accrual Clause, we need not consider Tekelec's alternative argument that the disputed payments "accrued" prior to the August 1, 2008 effective date of the Verint/NICE Settlement.

## IV.

We AFFIRM the district court's grant of summary judgment to Tekelec and denial of Verint's cross-motion for summary judgment.

---

[21] *See, e.g.*, BLACK'S LAW DICTIONARY 1356 (8th ed. 2004) (defining "royalty" as "a payment made to an . . . inventor for each copy of a work or article sold under a . . . patent."); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1021 (10th ed. 1996) (defining "royalty" as "a payment made to an author or composer for each copy of a work sold or to an inventor for each article sold under a patent."); AMERICAN HERITAGE COLLEGE DICTIONARY 1190 (3d ed. 1993) (defining "royalty" as (i) "a share of the profit paid to a writer or composer out of the proceeds resulting from the sale or performance of his or her work" or (ii) "a share in the proceeds paid to an inventor or a proprietor for the right to use his or her invention or services.").

[22] *See generally* Morton I. Kamien & Yair Tauman, *Fees Versus Royalties and the Private Value of a Patent*, 101 Q. J. ECON. 471 (1986).

**Appendix — Chart of Relevant Parties and Agreements**

NICE and Verint reach global settlement of their patent disputes and NICE agrees to Non-Accrual Clause

**4**

Verint (Appellant)

V/N Settlement (8/1/08)

NICE

Tekelec (Appellee)

Verint assumes Blue Pumpkin's rights and obligations under BP/IEX Agreement, incl. license in '355 Patent and obligation to make the five remaining Section 6.1.2 Payments (~5/07)

**3**

IEX assigns its right to the six Section 6.1.2 Payments to Tekelec (7/6/06)

**2**

Blue Pumpkin

BP/IEX Agreement (4/6/06)

IEX

**1**

IEX grants Blue Pumpkin a license in '355 Patent and Blue Pumpkin agrees to make the six Section 6.1.2 Payments

'355 Patent