# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0332

═══════════

BARROW-SHAVER RESOURCES COMPANY, PETITIONER,

v.

CARRIZO OIL & GAS, INC., RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS

═══════════════════════════════

JUSTICE GUZMAN, joined by CHIEF JUSTICE HECHT and JUSTICE BUSBY, concurring and dissenting.

A jury found Carrizo Oil & Gas, Inc. breached a farmout agreement with Barrow-Shaver Resources Co. by unreasonably withholding consent to an assignment of the agreement while attempting to extract a $5 million consent-procurement fee. Disregarding the jury's findings, the Court holds the farmout agreement's terms permitted Carrizo to do so. The Court's construction of the farmout agreement as allowing Carrizo to act unreasonably in withholding consent is analytically flawed in several respects, but most notably in repudiating trade usage and custom as an aid to contract interpretation. And though the Court embraces a construction of the contract that allows Carrizo to "refuse consent for any reason, expressed or not, reasonable or not, legitimate or not, or

no reason at all,"[1] it simultaneously shrinks from that holding by repeatedly asserting—contrary to the jury's findings—that Carrizo actually had valid reasons for withholding consent.

In determining whether the farmout agreement's consent-to-assign clause is qualified by reasonableness, the threshold question is: what does the contract say? Only if the consent provision is unqualified would we then consider whether reasonableness is either required by statute or other law or implied as a matter of public policy. The Court muddles these analytical steps and, consequently, misapplies case law regarding the latter two concepts in construing the farmout agreement. The law applicable to each analytical step differs, but the Court consistently ignores the distinctions in determining what the farmout agreement's terms mean.

I part company with the Court at the first analytical step—what the contract says. The point of disagreement is not, as the Court suggests, whether reasonableness should be judicially imposed. Here, the jury found reasonableness is baked into the contract language through trade custom and usage, and the record bears evidence to support that finding. The Court categorically rejects evidence that trade custom and usage informs the consent clause's meaning on the basis that words with ordinary meanings, like "consent", are not amenable to any industry-specific usage. This is wrong. "The normal effect of a usage on a written contract is to vary its meaning from the meaning it would otherwise have," so long as the usage has "such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular

---

[1] *Ante* at 37.

agreement."[2]  Consulting trade custom and usage to interpret contract terms is a centuries-old practice firmly rooted in our jurisprudence, recognized by learned treatises, and applicable to commercial contracts nationwide, including in Texas.

The Court's rejection of trade-custom-and-usage evidence leads to an erroneous construction of the farmout agreement, abrogates established contract-construction principles, and threatens to unsettle industry expectations about what industry-specific contracts mean.[3]  The Court's insistence on characterizing the record contrary to the jury's findings is equally alarming but ultimately proves the industry expects industry players to act reasonably in multi-million dollar energy transactions.[4] Because the Court's analysis and construction of the farmout agreement is erroneous and disconcerting, I respectfully dissent.  I concur in the fraud judgment, however, because I would arrive at the same judgment for different reasons.

## I. Background

The contract-construction issue in this case involves a consent-to-assign clause in a farmout agreement between Barrow-Shaver and Carrizo, two oil and gas companies.  Carrizo owned leasehold interests for depths below 2,500 feet of the 22,000-acre Parkey Ranch, which were acquired from Pan American Operating, Inc. (the Parkey lease).  PanAmerican, in turn, had acquired

---

[2] RESTATEMENT (SECOND) OF CONTRACTS § 220 cmt. d (AM. LAW INST. 1981); *id*. § 222(1); *see id*. § 220 reporter's note cmt. d ("The cases supporting the Illustrations below make clear that no matter how plain a meaning may be to a laymen, it may turn out to have a different and perhaps even contradictory meaning when a special usage is proven."); TEX. BUS. & COM. CODE § 1.303(c).

[3] Trade custom and usage exists for a reason—it lowers transaction costs and facilitates industry development. David McGowan, *Recognizing Usages of Trade: A Case Study from Electronic Commerce*, 8 WASH. U.J.L. & POL'Y 167, 184 (2002).

[4] *See* RESTATEMENT (SECOND) OF CONTRACTS § 221 cmt. b ("[T]he fact that a usage is reasonable may tend to show that the parties contracted with reference to it or that a particular party knew or had reason to know of it.").

its leasehold interests for all the depths under the Parkey Ranch from Cleo Oil, Inc., who had a lease with the original mineral owner, James R. Parkey. Each mineral owner in the chain of title, from Parkey to Carrizo, was entitled to a share of royalty; PanAmerican and Carrizo also retained an "overriding royalty," a cost-free share of production.

Carrizo acquired the Parkey lease as part of its "Kingdom Prospect," envisioning development of a cumulative 40,000-acre tract using horizontal drilling technology. As the best laid plans of mice and men often go awry, the geologic structure underneath the Parkey Ranch was more complicated than Carrizo expected, rendering horizontal drilling infeasible. Carrizo had also drilled several vertical wells on the lease, but the production was "not commercial." After spending millions of dollars attempting to develop the Parkey lease, Carrizo abandoned its development efforts. With the Parkey lease nearing expiration, Carrizo set its sights on a farmout arrangement.

About a month before the Parkey lease's expiration date, Carrizo and Barrow-Shaver began negotiating a "drill-to-earn" farmout agreement, under which Carrizo would assign to Barrow-Shaver certain Parkey-lease acreage for each well Barrow-Shaver drilled that met specified standards. Barrow-Shaver sent Carrizo the initial draft of the farmout agreement, which did not include a consent-to-assignment clause. Carrizo responded with a revised draft that included the following provision:

> The rights provided to [Barrow-Shaver] under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo which consent shall not be unreasonably withheld.

In a subsequently revised draft, Carrizo deleted the "shall not be unreasonably withheld" language. Barrow-Shaver initially objected to the deletion but eventually acquiesced after Carrizo

repeatedly gave verbal assurances that it would give "consent down the road." The final and effective version of the farmout agreement includes an assignment clause that reads:

> The rights provided to [Barrow-Shaver] under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo.

As required by the farmout agreement, Barrow-Shaver drilled a well on the Parkey Ranch to hold the mineral lease before it expired. But—mice and men again—after expending $22 million to drill the well, Barrow-Shaver's operations under the farmout agreement failed.

A year later, Raptor Petroleum II, LLC, a "well-funded start-up" founded by "mostly ex-Anadarko engineers," approached Barrow-Shaver about obtaining several mineral interests, including an assignment of the Parkey lease farmout. Barrow-Shaver and Raptor reached a deal by entering into a purchase-and-sale agreement, pursuant to which Barrow-Shaver would, for $27.69 million, assign to Raptor a series of oil-and-gas agreements, including Barrow-Shaver's interests under the farmout agreement with Carrizo. The deal was set to close on July 3, 2012, but to do so, Barrow-Shaver would first have to obtain 32 consents from 14 individual mineral-interest holders.

By the end of May, Barrow-Shaver had obtained all but one of the necessary consents—Carrizo was the lone holdout. Eventually, on June 22, Carrizo sent Barrow-Shaver an email with a single line—"Carrizo does not consent to the assignment." With the closing date fast approaching, Barrow-Shaver sought Carrizo's reconsideration. Finally, on July 2, 2012—the day before Barrow-Shaver and Raptor's deal was to close—Carrizo insisted on a buy-out of the Parkey lease for $5 million in lieu of consenting to the assignment. Chip Johnson, Carrizo's CEO, later

5

testified that the "sole reason" for Carrizo to continue withholding consent was that Barrow-Shaver would not pay the $5 million asking price. Barrow-Shaver did not accept Carrizo's offer, and because Carrizo refused to consent, the deal with Raptor fell through.

Barrow-Shaver sued Carrizo for breach of contract, fraudulent inducement, fraudulent nondisclosure, and tortious interference with a contract. The trial court combined the two fraud claims, which, along with the breach-of-contract claim, are now on appeal. The breach-of-contract claim alleged Carrizo breached the farmout agreement by unreasonably withholding its consent to the assignment. The parties agreed the consent-to-assign clause was unambiguous, but while Barrow-Shaver argued industry custom and usage supplied a reasonableness limitation on the right to withhold consent, Carrizo urged the provision's silence about restraints equated to the parties' agreement that Carrizo could withhold consent "for any reason," reasonable or not. The trial court agreed with Barrow-Shaver and allowed the parties to present testimony about whether industry custom and usage limited Carrizo's ability to withhold consent.

After witnesses, including experts on both sides, had testified, the issue was submitted to the jury with the following instruction:

Did Carrizo fail to comply with the Farmout Agreement?

You are instructed that the Farmout Agreement is silent about the reasons under which Carrizo could refuse consent to [Barrow-Shaver]'s assignment of the Farmout Agreement to Raptor. Therefore, you may consider evidence of industry custom and expectations in deciding whether Carrizo breached its agreement with [Barrow-Shaver]. [Barrow-Shaver] contends that there was a custom and usage in the oil and gas industry that a consent to assignment not be unreasonably withheld. Custom and usage refers to a practice that is so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it.

6

Answering "yes," the jury found that, in accordance with industry custom and usage, the consent clause in the farmout agreement required Carrizo to act reasonably and Carrizo had breached the contract by unreasonably withholding its consent. As damages, the jury awarded $27.69 million to Barrow-Shaver, the exact amount of the consideration for the purchase-and-sale agreement between Barrow-Shaver and Raptor.

With respect to the fraudulent-inducement claim, Barrow-Shaver alleged Carrizo repeatedly stated it would consent to an assignment of the farmout agreement even though it never intended to do so and these misrepresentations induced Barrow-Shaver to enter the farmout agreement. Barrow-Shaver's fraudulent-nondisclosure claim focused on the time period it was negotiating with Raptor and alleged Carrizo made material misrepresentations that created the false impression that Carrizo would consent to the Raptor assignment. The trial court combined the two fraud claims and gave the jury a general fraud instruction. The jury again sided with Barrow-Shaver, awarding $1.7 million in fraud damages.[5]

In moving for final judgment, Barrow-Shaver elected the breach-of-contract remedy over the fraud remedy. Accordingly, the trial court rendered judgment for Barrow-Shaver, awarding $27.69 million in contract damages along with $1 million in attorneys' fees and $2.9 million in prejudgment interest.

---

[5] Barrow-Shaver claimed fraud damages of $888,000 for converting the well on the Parkey lease into a saltwater well and another $800,000 expended to keep some of the leases alive.

## II. Discussion

## A. Breach of Contract

### 1. Trade Custom and Usage May Inform An Unambiguous Contract

Disregarding the jury's finding on trade custom and usage, the Court today holds that, as a matter of law, the consent provision authorized Carrizo to withhold its consent for any reason, no reason, or as a bargaining chip to extract a $5 million pay day at the eleventh hour.[6]  The Court categorically discards trade custom and usage on the grounds that "the term [consent] can easily be understood according to its plain, ordinary, and generally accepted meaning."[7]  This is a fundamental analytical mistake that ignores precedent.

Consulting trade custom and usage to inform the meaning of words and expressions in a contract is neither a novel idea nor a modern convention.[8]  More than a hundred years ago, we acknowledged that,

> where there is nothing in the agreement to exclude the inference, the parties are always presumed to contract in reference to the usage or custom which prevails in the particular trade or business to which the contract relates; and the usage is

---

[6] Contrary to the Court's construction of the contract as authorizing Carrizo to withhold consent for any reason, the Court repeatedly denies that Carrizo could ever leverage its consent power to extort a payout from Barrow-Shaver. *Ante* at 40.  And contrary to the jury's findings, the Court repeatedly denies that Carrizo did, in fact, act unreasonably and wrongfully in refusing to consent to the assignment while at the same time conditioning consent on a $5 million buyout when the deal with Raptor was at a make-or-break deadline.  *Id.* at 39-40.

[7] *Id.* at 12.

[8] *Schaub v. Dall. Brewing Co.*, 16 S.W. 429, 430 (Tex. 1891) ("Custom and usages of trades are admitted in evidence for well-defined purposes, [including] . . . to construe contracts in relation thereto, and to ascertain the meaning of words and expressions therein, as well as for many other purposes."); *see* TEX. BUS. & COM. CODE § 1.303(c) ("A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question."); *accord* U.C.C. § 1-303(c); RESTATEMENT (SECOND) OF CONTRACTS §§ 220 (usage relevant to interpretation), 221 (usage supplementing an agreement).

admissible for the purpose of ascertaining with greater certainty what was intended by the parties.[9]

Notwithstanding the Court's assertion to the contrary, even when terms "can easily be understood according to [their] plain, ordinary, and generally accepted meaning,"[10] industry custom and usage informs the meaning of terms that might otherwise seem intuitive to industry outsiders.[11] Numerous states have long held so,[12] and Texas is no exception.

In *Schaub v. Dallas Brewing Co.*, for example, the Court held that beer kegs were "accessories, appliances, or appurtenances" based on industry usage.[13] We reasoned that the

---

[9] *Dwyer v. City of Brenham*, 7 S.W. 598, 599 (Tex. 1888).

[10] *Ante* at 11.

[11] *Dwyer*, 7 S.W. at 599 ("[C]ustom may control and vary the meaning of words, giving, even to such words as those of number, a sense entirely different from that which they commonly bear, and which, indeed, by the rules of language, and in ordinary cases, would be expressed by another word."); *see* RESTATEMENT (SECOND) OF CONTRACTS §§ 220 cmt. d & reporter's note cmt. d, 222 cmt. b (noting usage is not required to "be consistent with the meaning the agreement would have apart from the usage"); 12 WILLISTON ON CONTRACTS § 34:5 (4th ed.) ("[N]umerous cases have been decided in which words with a clear normal meaning were shown by usage to bear a meaning which was not suggested by the ordinary language used. This is not only true of technical terms, but of language that, at least on its face, has no peculiar or technical meaning or significance. Therefore, evidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract when other parol evidence would be inadmissible.").

[12] *See, e.g.*, *Musser Davis Land Co. v. Union Pacific Res.*, 201 F.3d 561, 568 (5th Cir. 2000) (holding under Louisiana law, industry usage means "the right to conduct prudent, reasonable seismic operations is implied within the exclusive and unqualified right to explore the leased premises for oil and gas"); *Hickman v. Groves*, 71 P.3d 256, 261 (Wyo. 2003) (holding the appellant's proffered testimony on the oil-and-gas-industry usage raised a fact issue as to whether the words "oil rights" as used within the warranty deed included both "oil and gas rights"); *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) ("In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract."); *Cleveland v. Mascho*, 175 P. 927, 930 (Okla. 1918) ("[I]f . . . particular words and expressions have by usage acquired a meaning different from their plain, ordinary, and popular meaning, the parties using those words in such a contract must be taken to have used them in their peculiar sense . . . ."); *Rastetter v. Reynolds*, 66 N.E. 612, 613 (Ind. 1903) ("Common terms . . . may, in a particular business or trade, acquire a peculiar and different signification from that generally given to them."); *Soutier v. Kellerman*, 18 Mo. 509, 510-12 (Mo. 1853) (holding the evidence established a trade usage in the lumber industry that "4,000 shingles" as written in the contract meant eight packs of shingles without reference to the number of pieces in the pack).

[13] 16 S.W. at 430.

9

meaning of the terms "would depend on the use [the terms] were put to, their relation to the business, as well as the common understanding or custom in such establishments."[14] We held that "[e]vidence directed to such inquiries would be admissible" and, in that particular case, "it was proved[] by persons of experience in the brewing business."[15]

Another well-known example is a baker's "dozen." In the baking industry, the term means thirteen even when the ordinary understanding of "dozen" is twelve.[16] Similarly, this Court has noted that a "thousand" rabbits may mean 1,200; a "day" may mean 10 hours; and "4,000" shingles may mean 4,500.[17] Standing alone, none of these terms is industry specific; rather, lay people use them on a daily basis. The Court's holding today that trade custom and usage has no applicability to terms that are "not susceptible to more than one meaning[] and [are] not industry or vocation specific" is manifestly wrong.[18] And if industry custom and usage can inform the meaning of an ostensibly certain number, a soft term, like "consent," could also carry a commercially significant context-dependent meaning, so long as the party asserting the custom and usage can meet its burden of proving the custom and usage has such regularity of observance as to justify an expectation that it will be observed with respect to the transaction in question.[19] Contrary to the Court's assertion,

---

[14] *Id.*

[15] *Id.*

[16] WILLISTON ON CONTRACTS § 30.11.

[17] *Dwyer v. City of Brenham*, 7 S.W. 598, 599 (Tex. 1888).

[18] *Ante* at 22.

[19] *See, e.g.*, *Modine Mfg. Co. v. N.E. Indep. Sch. Dist.*, 503 S.W.2d 833, 837-41 (Tex. App.—Beaumont 1973, writ ref'd n.r.e.) (holding the trial court erred in excluding custom-and-usage testimony that, in the air-conditioning industry, reasonable variations in cooling capacity were considered to comply with the specifications, even when the

10

consulting trade custom and usage here does not "add, alter, or change the contract's agreed-to terms";[20] rather, the issue presented is what the "agreed-to terms" mean in the first instance, and evidence of trade custom and usage is admissible for that purpose.[21]

## 2. Trade Custom and Usage Informs the Meaning of the Consent Clause

"The existence and scope of a usage of trade are to be determined as questions of fact."[22] Here, both parties called witnesses to testify about the asserted custom and usage. Jason Perkins, Raptor's representative, testified that people in the oil-and-gas industry "would have the expectation that [certain] factors [] would be considered in the decision to grant or withhold consent." Bruce Kramer, a leading scholar in the oil-and-gas industry, confirmed Perkins's testimony and further testified that those "factors" focus on the financial and technical expertise and reputation of the potential assignee. This evidence raises a fact issue regarding whether industry custom and usage

---

specifications did not authorize any deviations); *see also Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995); *cf.* TEX. BUS. & COM. CODE § 1.303(c) ("The existence and scope of such a usage must be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.").

[20] *Ante* at 21.

[21] Section 222 of the *Restatement (Second) of Contracts* provides several illustrative examples:

A promises to act as B's agent in a certain business, and B promises to pay a certain commission for each "order." By a local usage in that business, "order" means only an order on which the purchaser has paid a certain price. Unless otherwise agreed, the usage is part of the contract.

A and B enter into a contract of charter party in which A promises to discharge the vessel "in 14 days." Usage in the shipping business may show this means 14 working days.

A and B enter into a contract for the purchase and sale of "No. 1 heavy book paper guaranteed free from ground wood." Usage in the paper trade may show that this means paper not containing over 3% ground wood.

Cmt. b, illus. 3, 5, 6.

[22] *Id.* § 222(2).

11

limited the circumstances under which Carrizo could withhold its consent to an assignment of the farmout agreement. And because the existence and scope of a particular custom and usage is ordinarily a question of fact, the issue was properly submitted to the jury,[23] and we cannot disturb the jury's finding that the contracting parties understood the consent-to-assign clause to mean consent could not be unreasonably withheld.[24]

The Court's categorical rejection of trade-custom-and-usage evidence leads the Court to the erroneous conclusion that the consent clause is "silen[t] as to refusal or withholding of consent."[25] In so holding, the Court assumes express language is necessary for the consent clause to mean consent cannot be unreasonably withheld. But this assumption fails because reasonableness is already embedded in the contract through trade custom and usage. The Court's contrary assertion notwithstanding, reading a particular industry custom and usage into the consent provision would not rewrite the agreement because the custom and usage preexisted the agreement and "the parties are always presumed to contract in reference" to it "where there is nothing in the agreement to

---

[23] *Sun Oil Co. v. Wortman*, 486 U.S. 717, 731 n.4 (1988); *see* TEX. BUS. & COM. CODE § 1.303(c) (unless established by a trade code or similar document, "[t]he existence and scope of such a usage must be proved as facts"); RESTATEMENT (SECOND) OF CONTRACTS § 222(2) ("The existence and scope of a usage of trade are to be determined as questions of fact.").

[24] *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) ("We will uphold the jury's finding if more than a scintilla of competent evidence supports it.").

[25] *Ante* at 12.

12

exclude the inference."[26]  The absence of an otherwise redundant reasonableness qualifier does not deprive the clause of the meaning trade custom and usage confers.

Indeed, Carrizo's initial offering of a draft with reasonableness explicitly expressed indicates Carrizo's knowledge that an industry usage, as the jury found, imparts reasonableness into such a clause.  The revised draft dropping the express qualifier—while not explicitly allowing consent to be withheld for any reason—is consistent with the jury's finding that the usage was already part of the parties' contract.  Because reasonableness was embedded in the clause, no additional covenants or obligations would be imposed on Carrizo by reading the contract according to industry expectations.[27]  Cases implying terms or imposing a duty of good faith and fair dealing when the contract is silent—authority Carrizo and the Court rely on—are irrelevant to the analysis of what the contract says in the first place.[28]

### 3. Negotiation History Is Barred as Parol Evidence

The Court and JUSTICE BOYD are at odds about consulting trade custom and usage to inform the consent clause's meaning, but they both urge that any consideration of such evidence

---

[26] *Dwyer v. City of Brenham*, 7 S.W. 598, 599 (Tex. 1888)*; see* RESTATEMENT (SECOND) OF CONTRACTS § 220; *cf. Nat'l Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521-22 (Tex. 1995) (excluding extrinsic evidence that would show the parties intended to carve out a certain kind of damages from the insurance polices' exclusions when the policies explicitly used the terms "*absolute* pollution exclusions").

[27] *Ante* at 11-12, 15, 25.  The case the Court tethers its analysis to, *Kachina Pipeline Co. v. Lillis*, is therefore distinguishable.  471 S.W.3d 445 (Tex. 2015).  In *Kachina Pipeline*, the Court refused to consult a trade custom and usage that oil producers would typically share all compression costs with buyers because the agreement at issue expressly allowed the buyer to deduct compression costs only in a specific circumstance. *Id.* at 450-51, 454; *cf. Murphy Explor. & Prod. Co.–USA v. Adams*, 560 S.W.3d 105, 121 (Tex. 2018) (JOHNSON, J., dissenting) (noting that interpreting the term "offset well" in leases based on trade custom and usage would not add language to the leases or alter their terms because the trade-usage meaning existed "long before . . . in the context of oil and gas leases").

[28] *Ante* at Part II.A.2.

13

necessitates admission of all evidence pertaining to the parties' negotiation history—not just the prior drafts and oral representations that were admitted into evidence, but also evidence of the parties' subjective beliefs.[29] This, however, plainly violates the parol evidence rule. When a contract is written and unambiguous, like the consent clause here, the parol evidence rule prohibits consideration of oral or extrinsic evidence to modify or contradict the contract's terms.[30]

To circumvent this fundamental contract-construction principle, both the Court and JUSTICE BOYD contend the parties' negotiation history must be admitted into evidence—not to establish the terms of the parties' written contract—but to show the parties' intent to exclude the usage.[31] But when the only purpose of extrinsic evidence is to show the parties intended the contract to say something other than what it says, such evidence is inadmissible.[32]

Parties can certainly contract around a trade usage, but the intent to do so must be clear from the contract itself:

> Under the common law, a custom or usage may be excluded from the terms of the contract either expressly or by implication. It is not necessary that the parties state in terms that the usage is not adopted as part of the contract if they otherwise make their intention manifest. It is a sufficient ground for rejecting a custom as affecting the rights of parties to a contract that it is excluded by necessary implication of the contract itself. Evidence of custom or usage is therefore inadmissible when either expressly or impliedly excluded *by the terms of the contract*. . . . The test as to

---

[29] *Ante* at 25-28; *post* at 2-5 (BOYD, J., dissenting).

[30] *West v. Quintanilla*, 573 S.W.3d 237, 243 n.11 (Tex. 2019); *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 758 (Tex. 2018).

[31] *Ante* at 25-28; *post* at 4-5 (BOYD, J., dissenting).

[32] *Anglo-Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) (circumstances surrounding a contract's execution "cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated").

> whether the custom or usage is repugnant to the contract is whether the custom or usage, if written into the contract, would make it not sensible or inconsistent.[33]

The determination of whether the parties did or did not intend to contract with respect to a trade custom or usage depends on "the terms of the particular contract in dispute," considered "as a whole, including both its express words and its necessary implications."[34]  Whether the parties intended to negate a particular usage is thus determined by consulting the contract language.  The authority the Court and JUSTICE BOYD cite as requiring consideration of the negotiation history does not support the proposition that evidence directed to the parties' subjective intent is—contrary to the parol evidence rule—admissible.[35]

---

[33] 12 WILLISTON ON CONTRACTS § 34.11 (emphasis added); *see Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450-51, 454 (Tex. 2015) (declining to consult a trade custom and usage because it would conflict with the contract's express terms).

[34] 12 WILLISTON ON CONTRACTS § 34.11.

[35] *See ante* at 25-26 and *post* at 4-5 (BOYD, J., dissenting), relying on the following authority:  *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 769 (Tex. 2018) (*excluding* extrinsic evidence of the party's subjective intent to construe the unambiguous contract language); *Nat'l Union Fire Ins., Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521-22 (Tex. 1995) (*excluding* extrinsic evidence that would show the parties' intent to contradict express contract language); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 515-19 (Tex. 1968) (providing no discussion and raising no issue about the parties' intent to contract around industry custom and usage); RESTATEMENT (SECOND) OF CONTRACTS §§ 212 (commenting on when extrinsic evidence is admissible to interpret an integrated agreement without any discussion as to whether this kind of evidence can be used to show the parties' intent to contract around industry custom and usage), 222 (stating only that trade usage becomes part of the contract "unless agreed otherwise" without saying a contradictory agreement can be established by parol evidence); 25 C.J.S. *Customs & Usages* §§ 27, 29 (using extrinsic evidence to ascertain the meaning of contract terms rather than to establish parties' intent to contract around industry custom and usage); 12 WILLISTON ON CONTRACTS § 34:11 (indicating intent to disclaim a trade usage must be found *within* the contract's terms); David H. Moore, *The Parol Evidence Rule and the United Nations Convention on Contracts for the International Sale of Goods: Justifying* Beijing Metals & Minerals Import/Export Corp. v. American Business Center, Inc., 1995 B.Y.U. L. REV. 1347, 1354-55 (1995) (discussing separately whether evidence of trade usage and prior negotiations should each be admitted to interpret a contract rather than supporting the proposition that prior negotiations are admissible to establish the parties' intent not to incorporate the usage).

Carrizo could have contracted around trade custom and usage, but it chose not to.[36] To limit or exclude a trade custom or usage, parties can expressly agree that trade custom and usages will not apply to the contract.[37] Another method for excluding a trade usage is to define terms in a way that differs from the industry understanding.[38] Here, Carrizo could haven excluded the trade usage by generally disclaiming any intent to contract with regard to a usage or expressly stating that consent could be withheld for any or no reason. Carrizo not only failed to contract around the trade custom and usage, it repeatedly assured Barrow-Shaver it would give consent—confirming, rather than negating, an intent to conform to industry custom.[39]

Even if evidence of the parties' negotiations were admitted, it would yield, at best, equal inferences. Perhaps the Court and JUSTICE BOYD are correct that if additional negotiation evidence were admitted, the jury could infer the parties agreed to an unqualified consent clause because a reasonableness limitation was expressly inserted and then purposefully removed from drafts of the farmout agreement. Even so, the same circumstances—especially coupled with Carrizo's oral promises—are equally consistent with the parties' understanding that the deleted language was redundant because the consent clause was already subject to a reasonableness standard. Under the

---

[36] *See* Bruce E. Cryder & R. Clay Larkin, *Consent Provisions in Natural Resource Agreements*, 30 ENERGY & MIN. L. INST. 55, 93 (2009) ("Given the strong trend toward requiring that consent be only 'reasonably' withheld, drafters should not neglect this aspect of the lease. If the parties intend that consent may be unreasonably or arbitrarily withheld, this should be stated explicitly and specifically in the consent provision.").

[37] 12 WILLISTON ON CONTRACTS § 34.11.

[38] *Id.*

[39] RESTATEMENT (SECOND) OF CONTRACTS § 221 cmt. d (a usage is not applicable only "[i]f either party has reason to know that the other has an intention *inconsistent* with a particular usage" (emphasis added)).

equal inferences rule, the negotiation history has no evidentiary value, and the trial court did not err in excluding it on that basis or on parol evidence grounds.[40]

### 4. Trade Custom and Usage Is Not Equivalent to Judicially Imposed Terms

Based on the false conclusion that the consent clause is "silent" as to withholding consent, the Court refuses to read into the clause a reasonableness requirement as the jury found, alleging courts should not supplement "terms [that] are immaterial to the farmout agreement."[41] This misstates the law.

First, the scope of trade custom and usage is much broader than the material and essential terms the Court contemplates—trade custom and usage actually includes an array of practices not just a single term like timing, price, or quantity.[42] Second, and more importantly, when giving effect to a trade custom and usage, a court is not imposing a definite term that *the court* itself considers reasonable, but rather a usage formed by *the industry*. These distinctions explain why the *Restatement (Second) of Contracts* treats these two contract-interpretation approaches differently and defers to trade custom and usage—under Restatement section 204, *courts* may impose a

---

[40] *See City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) ("When the circumstances are equally consistent with either of two facts, neither fact may be inferred.").

[41] *Ante* at 15.

[42] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 221 cmt. b, illus. 3 (interpreting a stock order in accordance with the usages of the New York Stock Exchange); *Dall. Oil & Ref'g Co. v. Wash. Cotton Oil Co.*, 283 S.W. 345, 346 (Tex. App.—El Paso 1926, writ dism'd w.o.j.) (noting the witnesses all agreed that the words "first made October, as made" in the cotton-oil contract are "trade terms" and mean (1) the oil sold is oil produced in October; (2) "first made" means the buyer has the right to demand, and the seller has the right to require the buyer to accept, the first made in that month; and (3) "as made" means that as each tank car is produced, the buyer has the right to demand its delivery, and the seller has the right to demand its acceptance).

reasonableness term only when the term is essential to the contract[43] and only when there's no applicable trade custom and usage;[44] in comparison, section 221 provides that trade custom and usage prevails over terms courts might supply under section 204 and is not limited to supplementing only material or essential terms.[45] In portraying my analysis as "a veiled attempt to use industry custom and usage to create a covenant of reasonableness and good faith," the Court conflates these interpretive approaches.[46] Indeed, none of the authority the Court cites supports the proposition that trade custom and usage is limited to supplying material or essential terms.[47]

Mindful of the conceptual distinction between these two approaches, I am not proposing to impose reasonableness on the parties as a matter of law; rather, reasonableness is woven into this particular clause because in this particular context, industry custom and usage, as found by the jury, demands so. Consulting trade custom and usage for contract interpretation is far from being a

---

[43] RESTATEMENT (SECOND) OF CONTRACTS § 204.

[44] *Id.* § 221 cmt. a ("[When a contract fails to avert to the problem with which the usage deals,] *in the absence of usage*, the court would supply a reasonable term [according to section 204]. *But if* there is a reasonable usage . . . , it is a surer guide than the court's own judgment of what is reasonable. Thus a usage may make it unnecessary to inquire into or prove what the actual intentions of the parties were with respect to an unstated term." (emphasis added)).

[45] *Id.*

[46] *Ante* at 25.

[47] *See ante* at 13-15, 22-24; *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239-40 (Tex. 2016) (considering trade usage as one source for construing contract language without confining it to supplementing only essential terms); *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (considering whether a contract had all the material terms essential to enforceability, but not involving any question of trade custom and usage); *Centex Homes v. Buecher*, 95 S.W.3d 266, 274 (Tex. 2002) (noting courts may supplement implied terms based on Restatement section 204, which as discussed above, is distinguished from consulting trade usage); *Nat'l Union Fire Ins. Co. v. CBI Indus. Inc.*, 907 S.W.2d 517, 521 (Tex. 1995) (holding extrinsic evidence is inadmissible to contradict or vary the meaning of explicit contract language without addressing whether the contract terms were material or essential); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (the issue being whether sufficient evidence established a material contract term necessary to make the contract enforceable and having nothing to do with trade usage).

newfangled idea. Courts act as gatekeepers in requiring proof to raise an issue about trade custom and usage, and when parties have duly satisfied their burden of proof, we must trust our juries to evaluate evidence of the existence and meaning of a proffered custom and usage.[48] The Court's concern that introducing trade custom and usage would subject "every term, word, or phrase in every agreement" to "litigation and ultimately a jury determination" is no more than groundless hysteria.[49] The notion that trade custom and usage can inform the meaning of a contract's terms is centuries old and has yet to create the cataclysm the Court fears.[50]

## 5. The Court's Holding Thwarts Oil and Gas Development and Distorts the Jury's Findings

Context matters when interpreting a contract,[51] especially when industry custom and usage is at issue.[52] When the contractual context is considered here, the Court's holding is even more troubling. A farmout agreement is "[a] very common form of agreement between operators,

---

[48] At bottom, the Court's true quarrel is with the nature of the evidence the trial court relied on in finding a fact issue about trade custom and usage. *See* RESTATEMENT (SECOND) OF CONTRACTS § 220(1) & cmt. b (usage is relevant to interpretation if each party knew or had reason to know of the usage, so "a party who asserts a meaning based on usage must show either that the other party knew of the usage or that the other party had reason to know of it"). The Court avoids tackling the evidentiary issue head on by taking a back-door approach that effectively precludes any term with an "ordinary" meaning from having a trade custom and usage. As trade custom and usage often informs the meaning of words that are unambiguous in their ordinary or legal meaning, this approach abrogates trade custom and usage as a viable contract-construction principle. *See supra* part II, A.1. Indeed, Carrizo challenged before the court of appeals the sufficiency of the trade-custom-and-usage evidence Barrow-Shaver proffered, but Carrizo did not fully brief the argument here. In any event, Carrizo's challenge goes to the weight of evidence, and I would conclude the trial court properly exercised its discretion in allowing evidence on trade custom and usage.

[49] *Ante* at 22.

[50] *See* Hubert Hall, *Select Cases concerning the Law Merchant*, *A.D. 1239-1633*, at 15 (46 Selden Society, Bernard Quaritch 1930).

[51] *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011).

[52] *Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 665 (5th Cir. 2013) ("Under Texas law, the words of a contract must be read in context . . . ."); *see* David E. Pierce, *Defining the Role of Industry Custom and Usage in Oil & Gas Litigation*, 57 SMU L. REV. 387, 451 (2004) ("There is no 'precedent' that establishes a usage in one case that will necessarily be applicable to another case. . . . [T]he function of usage evidence is to provide context to interpret a particular agreement, between specific parties.").

whereby a lease owner *not desirous* of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who *is desirous* of drilling the tract."[53] As the facts of this case illustrate, farmout agreements allow new parties with innovative ideas, more financial resources, or more advanced technologies to undertake more efficient operations under the mineral lease while allowing the farmor to preserve its leasehold interest.[54] The testimony at trial underscores the point. Brad Fisher, Carrizo's representative, testified that Carrizo's reason for arranging a farmout with Barrow-Shaver was to embrace "new ideas" that Barrow-Shaver could bring to drilling horizontal wells; and Scott Shaver, Barrow-Shaver's founder, likewise considered Raptor a "Godsend" with "a better idea" who "could do better."

By endorsing Carrizo's behavior—which the jury found to be unreasonable and fraudulent—the Court nullifies the fundamental goal of farmout agreements and frustrates public policy. Because Carrizo did not consent, Raptor lost the chance to replace Barrow-Shaver as the farmee to operate a lease that was no longer lucrative to Barrow-Shaver but still desirable to Raptor, and all the mineral-interest holders in the chain of title lost the opportunity to receive their share of royalty from Raptor's drilling operations. In fact, after the Raptor deal fell through and Barrow-Shaver's farmout expired, Carrizo did not drill any well on the tract and allowed the Parkey lease to expire. The shenanigans the Court says two sophisticated parties explicitly agreed to allow caused the minerals on the 22,000-acre Parkey tract to remain undeveloped, which is repugnant to

---

[53] Patrick H. Martin & Bruce M. Kramer, *Manual of Oil & Gas Terms*, *in* WILLIAMS & MEYERS, OIL AND GAS LAW, (LexisNexis Matthew Bender 2018) (emphasis added).

[54] *See* John S. Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 Sw. L.J. 759, 778-82 (1987) (discussing reasons why mineral lessees choose farmout arrangements).

our statewide policy to promote oil-and-gas exploration and development.[55] No one—including the holdout party—benefits from the Court's categorical holding.

To blunt what will surely be a holding detrimental to the oil-and-gas industry, the Court contrives to justify Carrizo's assumed motivations by directly and indirectly implying that Raptor was not a proper assignee,[56] despite (1) the jury's finding to the contrary and (2) the Court's asserted holding that reasonableness is entirely irrelevant. Ironically, the Court's continued validation of Carrizo's purported motives exposes the weakness in its analysis: the Court holds that Carrizo could withhold consent unreasonably under the terms of the contract without running afoul of public policy but defends that conclusion only by assuming Carrizo had a valid reason for withholding consent. Whether Raptor was a viable candidate and whether Carrizo behaved unreasonably under the circumstances are questions of fact for the jury to resolve, not the Court. Here, without giving a reason and as the sole hold-out, Carrizo pressed for a $5 million pay day knowing the clock was running out on Barrow-Shaver's deal with Raptor. The jury, as it was entitled to do, found Carrizo acted unreasonably. Second-guessing the jury findings is merely a diversion from the unsettling and expansive implications of today's opinion.

On that score, what is most disconcerting about the Court's opinion is the absence of any limiting principle. The Court's reasoning is rooted in general contract principles and is highly

---

[55] *See, e.g.*, *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 622-23 (Tex. 1971) (noting an alternative method of producing wells "would serve the public policy of developing our mineral resources"); *Brown v. Humble Oil & Ref. Co.*, 87 S.W.2d 1069, 1070 (Tex. 1935) (noting "the Legislature enacted certain laws which declare the public policy of the state with respect to the development and conservation of oil and gas").

[56] *Ante* at 39-40.

amenable to extrapolation beyond the narrow context of this case, thus inviting and even encouraging industry-wide holdout problems.

## B. Fraud

Because I would hold that Barrow-Shaver prevails on its contract claim and Barrow-Shaver elected that remedy, I would not reach the fraud claim. But if I were to reach the fraud claim, I would conclude Barrow-Shaver has a viable fraudulent-inducement claim.

Barrow-Shaver alleges, and the jury found, that Carrizo entered into the farmout agreement with no intent to consent to an assignment despite its oral representations that it would do so and contrary to contract terms that require it to reasonably do so. We have held that "a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract" because "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself."[57] We have recognized that "[b]reach alone is no evidence that breach was intended when the contract was originally made," but "breach combined with 'slight circumstantial evidence' of fraud is enough to support a verdict for fraudulent inducement."[58] And while fraudulent intent "is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."[59] The record here bears at least slight circumstantial evidence of intent not to perform, and Carrizo does not challenge the fraud verdict for the lack of fraudulent intent.

---

[57] *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998).

[58] *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006) (quoting *Formosa Plastics*, 960 S.W.2d at 48).

[59] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

22

The only fraud element contested here is justifiable reliance—that is, whether Barrow-Shaver's reliance on Carrizo's verbal promises was justified. The analysis of this question turns, in part, on what the contract says, and under a consent clause informed by trade custom and usage, Carrizo's verbal promises are entirely consistent with what the consent clause says. Accordingly, I would hold Barrow-Shaver established justifiable reliance as a matter of law. Nevertheless, because Barrow-Shaver elected to recover on its contract claim and could do so under my disposition, it ultimately would not recover on its fraud claim.

Unfortunately, my disposition of the contract claim has not carried the day. A majority of the Court concludes the consent clause is unqualified, and under that interpretation of the contract, the Court correctly concludes Barrow-Shaver would not be justified in relying on an oral representation that consent would be granted when the contract imposes no obligation on Carrizo to do so. I therefore concur with the Court's judgment on the fraud claim pursuant to which Barrow-Shaver takes nothing.

### III. Conclusion

I would reverse and render judgment in Barrow-Shaver's favor based on the jury's finding that Carrizo breached the farmout agreement by failing to act in accordance with the consent provision as understood in the industry. Though I disagree with the Court's contract analysis, the disposition of Barrow-Shaver's fraud claim turns on the contract's interpretation, and under either my disposition of the contract claim or the Court's, Barrow-Shaver would not recover on its fraud claim, albeit for distinctly different reasons. I therefore respectfully concur in part and dissent in part to the Court's opinion and judgment.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:** June 28, 2019

24